**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 1:26-cv-01387 (RBW) |
| APPROXIMATELY 4,982,722 USDT; | ) | |
| APPROXIMATELY 8,028,234 USDT; | ) | |
| APPROXIMATELY 5,282,673 USDT; | ) | |
| APPROXIMATELY 5,000,000 USDT; and | ) | |
| APPROXIMATELY 3,827,942 USDT, | ) | |
| | ) | |
| Defendants, in rem. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CLAIMANT BABA TECHNOLOGY LIMITED'S PARTIAL MOTION TO DISMISS COUNT TWO OF THE VERIFIED COMPLAINT FOR FORFEITURE IN REM**

# TABLE OF CONTENTS


INTRODUCTION ........ 1

BACKGROUND ........ 6

A. The Fraud Schemes and the Consolidation Address ........ 6

B. The July 26 to 29 Transfers ........ 7

C. The Counts ........ 8

D. Procedural Posture ........ 9

LEGAL STANDARD ........ 9

ARGUMENT ........ 12

I. THE DESIGN ELEMENT REQUIRES PURPOSE, NOT MANNER, AND THE COMPLAINT PLEADS ONLY MANNER ........ 13

II. THE COMPLAINT PLEADS NO KNOWLEDGE BY ANYONE WHO CONDUCTED THE TRANSFERS ........ 17

The § 1956(h) Theory Does Not Cure the Defects ........ 19

III. THE § 1956(a)(2)(B)(i) INTERNATIONAL THEORY CANNOT REACH THE UNTRACED 24.8 MILLION USDT BECAUSE THE COMPLAINT ALLEGES NO TRANSFER OF THOSE FUNDS INTO OR OUT OF THE UNITED STATES ........ 19

IV. EVEN IF THE JULY 26 TO 29 TRANSFERS WERE ADEQUATELY PLEADED AS DESIGNED TO CONCEAL WITH KNOWLEDGE, COUNT TWO STILL CANNOT REACH THE UNTRACED 24.8 MILLION USDT ........ 22

A. "Involved In" Reaches Commingled Funds Only Where the Pooling Was Designed to Conceal ........ 22

B. The Complaint Pleads Co-Location in a High-Volume Platform Wallet, Not Purposeful Pooling ........ 23

C. Neither the "Traceable To" Prong Nor § 984 Supplies an Alternative Route to the Untraced Funds ........ 25

CONCLUSION ........ 27

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*2,016,894.47 of Funds Associated with Cooperating Co. 1*, No. CV 19-803 (RC), 2025 WL 1575706 (D.D.C. Mar. 5, 2025) .......... 18
*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......... 10, 11, 12
*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .......... 10
**Cuellar v. United States*, 553 U.S. 550 (2008) .......... Passim
*Hettinga v. United States*, 677 F.3d 471 (D.C. Cir. 2012) .......... 11
*Luis v. United States*, 578 U.S. 5 (2016) .......... 23
*RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043 (D.C. Cir. 2012) .......... 11
*United States v. 8 Gilcrease Lane*, 587 F. Supp. 2d 133 (D.D.C. 2008) .......... 9
*United States v. 113 Virtual Currency Accounts*, No. 20-606 (TJK), 2024 WL 940141 (D.D.C. Mar. 5, 2024) .......... 3, 4, 12
*United States v. 280 Virtual Currency Accounts*, No. 20-2396 (TJK), 2024 WL 2049002 (D.D.C. 2024) .......... 3
**United States v. 674,739.480211 USDT*, 2026 WL 592743 (N.D.N.Y. Mar. 3, 2026) .......... 2, 12, 14, 25
*United States v. 1407 North Collins*, 901 F.3d 268 (5th Cir. 2018) .......... 4, 24
*United States v. $1,071,251.44 of Funds Associated with Mingzheng Int'l Trading Ltd.*, No. 17-cv-01166 (KBJ/GMH), 2018 WL 3949962 (D.D.C. June 29, 2018) .......... 10
*United States v. $429,900.00 of Blocked Funds Associated with Ryer Int'l Trading Ltd.*, No. 20-2546 (RC), 2021 WL 5050070 (D.D.C. Nov. 1, 2021) .......... 11, 17
*United States v. Abhishek Krishnan's Real & Pers. Prop.*, 469 F. Supp. 3d 481 (E.D.N.C. 2020) .......... 24
**United States v. Adefehinti*, 510 F.3d 319 (D.C. Cir. 2007) .......... Passim
**United States v. All Assets Held at Bank Julius Baer & Co.*, 571 F. Supp. 2d 1 (D.D.C. 2008) .......... Passim
*United States v. All Funds Presently on Deposit at Am. Express Bank*, 832 F. Supp. 542 (E.D.N.Y. 1993) .......... 26
*United States v. Bikundi*, 125 F. Supp. 3d 178 (D.D.C. 2015) .......... 24
*United States v. Bikundi*, 926 F.3d 761 (D.C. Cir. 2019) .......... 4

*United States v. Bornfield*,
145 F.3d 1123 (10th Cir. 1998) ..... 22
*United States v. Bowman*,
235 F.3d 1113 (8th Cir. 2000) ..... 4
*United States v. Braxtonbrown-Smith*,
278 F.3d 1348 (D.C. Cir. 2002) ..... 19
*United States v. Butler*,
211 F.3d 826 (4th Cir. 2000) ..... 21
*United States v. Carman*,
186 F. Supp. 3d 657 (E.D. Ky. 2016) ..... 15
*United States v. Esterman*,
324 F.3d 565 (7th Cir. 2003) ..... 15
*United States v. Jackson*,
935 F.2d 832 (7th Cir. 1991) ..... 15
*United States v. Johnson*,
440 F.3d 1286 (11th Cir. 2006) ..... 15, 16, 18, 19
*United States v. Kivanc*,
714 F.3d 782 (4th Cir. 2013) ..... 13
*United States v. Kramer*,
73 F.3d 1067 (11th Cir. 1996) ..... 20, 21
*United States v. Krasinski*,
545 F.3d 546 (7th Cir. 2008) ..... 21
*United States v. Law*,
528 F.3d 888 (D.C. Cir. 2008) ..... 3, 4, 15
*United States v. Mankarious*,
151 F.3d 694 (7th Cir. 1998) ..... 21
*United States v. One Gulfstream G-V Jet Aircraft*,
941 F. Supp. 2d 1 (D.D.C. 2013) ..... 10
*United States v. Piervinanzi*,
23 F.3d 670 (2d Cir. 1994) ..... 21
*United States v. Pole No. 3172, Hopkinton*,
852 F.2d 636 (1st Cir. 1988) ..... 11
*United States v. Puche*,
350 F.3d 1137 (11th Cir. 2003) ..... 22, 24
*United States v. Real Prop. Identified as Parcel 03179-005R*,
311 F. Supp. 2d 126 (D.D.C. 2004) ..... 13
*United States v. Sterlingov*,
755 F. Supp. 3d 17 (D.D.C. 2024) ..... 3, 4
*United States v. Stoddard*,
892 F.3d 1203 (D.C. Cir. 2018) ..... 4, 18
*United States v. Sum of $70,990,605*,
4 F. Supp. 3d 189 (D.D.C. 2014) ..... 10, 11
*United States v. Sum of $70,990,605*,
128 F. Supp. 3d 350 (D.D.C. 2015) ..... 23, 25
*United States v. Tarkoff*,
242 F.3d 991 (11th Cir. 2001) ..... 12

**United States v. Three Sums Totaling $241,386.58 in Seized U.S. Currency*,
No. 18-cv-750 (RBW), 2021 WL 2255174 (D.D.C. June 3, 2021) .............................. 10, 11, 24
*United States v. Tobin*,
676 F.3d 1264 (11th Cir. 2012) ........................................................................................ 4
*United States v. Wynn*,
61 F.3d 921 (D.C. Cir. 1995) ......................................................................................... 15

**Statutes**

18 U.S.C. § 981(a)(1)(A) ................................................................................ Passim
18 U.S.C. § 983(a)(3)(D) ................................................................................ 4, 10
18 U.S.C. § 983(c)(1) ................................................................................ 9, 10, 13
18 U.S.C. § 984 ................................................................................ 8, 25
18 U.S.C. § 984(a)(1) ................................................................................ 25
18 U.S.C. § 984(b) ................................................................................ 25
18 U.S.C. § 1956(a)(1)(B)(i), (a)(2)(B)(i) ................................................................................ 14, 17
18 U.S.C. § 1956(a)(1)(B)(i), (a)(2)(B)(i), and (h) ................................................................................ 2
18 U.S.C. § 1956(a)(2)(B) ................................................................................ 21
18 U.S.C. § 1956(h) ................................................................................ 8, 19
18 U.S.C. §§ 981 and 983 ................................................................................ 8
18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(a)(2)(B)(i) ................................................................................ 8
§ 983(c)(3) ................................................................................ 14, 25
§ 1956 ................................................................................ Passim
§ 1956(a)(1)(B)(i) ................................................................................ 11, 17
§ 1956(a)(1)(B)(i) and § 1956(a)(2)(B)(i) ................................................................................ 19
§ 1956(a)(2) ................................................................................ 20
§ 1956(a)(2)(A) ................................................................................ 21
§ 1956(a)(2)(B)(i) ................................................................................ Passim
§§ 981(a)(1)(A) and (C) ................................................................................ 24

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ................................................................................ 2

## INTRODUCTION

The Government seized 27 million Tether (USDT), a U.S. dollar-pegged stablecoin issued by Tether Limited, from Baba Tech. The vast majority of these funds are *not* the proceeds from a crime. The Government does not even attempt to allege it.

Instead, it alleges only 2.3 million of the seized 27 million in USDT is supposedly connected to unlawful activity. The Government pleads no underlying unlawful activity for the remaining 24.8 million in seized assets. Why then, has it taken 10x that amount in seized property?

The Government's sole basis is a theory of concealment. Specifically, the Government claims the remaining 24.8 million in USDT was used to conceal or disguise the unlawful proceeds of the 2.3 million in USDT. Its purported theory of concealment is outlined in just 3 paragraphs of a 93-paragraph, 42-page long complaint. In sum or substance, it alleges that funds were moved from one address on a *public* ledger to five other addresses on a *public* ledger.

Even accepting those allegations as true, it fails to state a claim as a matter of law because, *inter alia*, the Complaint alleges no design to conceal the funds at issue, which is a necessary element to the Government's claim. The funds were no more "disguised" or hidden after the transfer than before. As the law is abundantly clear, transferring funds alone is not enough. Likewise, the Government pleads no knowledge of unlawful activity, which is also a necessary element of the claim.

It is worth noting that the Government's entire theory for the initial seizure of assets, (which it attempted to execute through Tether on July 26, 2025) is based exclusively on facts that happened *after* it attempted to freeze the funds. Apparently, when it first attempted to seize 27 million in USDT, the Government had no grounds for the 24.8 million at issue. Now, with the

gift of hindsight from its own bad actions, it points to a handful of transfers between July 26 to July 29 to form the basis of its concealment theory. The Court need not address the Government's initial overreach in this motion, because, for the reasons that follow, even accepting those July 26 – July 29 transfers as true, it does not state a valid claim of concealment.

Claimant Baba Technology Limited ("Baba Tech") moves under Supplemental Rule G(8)(b) and Federal Rule of Civil Procedure 12(b)(6) to dismiss Count Two of the Verified Complaint for Forfeiture In Rem (ECF 1, the "Complaint") insofar as it fails to state a claim for forfeiture of Defendant Property that was not involved in (or traceable to property involved in) domestic or international concealment money laundering or conspiracy to engage in money laundering. Count Two seeks forfeiture of all 27,121,570.90 USDT of the Defendant Property under 18 U.S.C. § 981(a)(1)(A) as property "involved in" concealment money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i), (a)(2)(B)(i), and (h). Compl. ¶¶ 92-93. It is the only count that reaches beyond the funds the Government has traced to identified victims, as Count One seeks forfeiture of proceeds traceable to wire fraud, and the Complaint purports to trace 2,329,482 USDT to the twenty-three victims it identifies.[1] Compl. ¶ 81 (Fig. 7).

Count Two is thus the Government's vehicle for the remaining 24,792,088.90 USDT, roughly 91.4 percent of the seized property, which the Complaint does not connect to any victim. This Motion is directed at that remainder.[2]

The Complaint pleads the mechanics of the transactions that placed the Defendant Property in the five Subject Addresses in exhaustive detail. On July 26, 2025, at law

[1] Courts confronting a whole-account claim on such a proceeds theory limit forfeiture to the traced amount. *See, e.g.*, *United States v. 674,739.480211 USDT*, 2026 WL 592743 at *7 (N.D.N.Y. Mar. 3, 2026) ("The complaint also fails to explain how the entire 674,739.480211 USDT seized 'constitutes or is derived from proceeds traceable to' the wire fraud perpetrated upon the Victim.").

[2] Baba Tech does not ask the Court to dismiss Count Two as to the 2,329,482 USDT the Complaint purports to trace from identified victims through the fraudsters' alleged laundering into the Consolidation Address.

enforcement's request, the stablecoin issuer Tether "attempted to voluntarily freeze" a platform wallet the Complaint calls the "Consolidation Address"; the balance "was withdrawn, however, just as Tether was applying the freeze"; within fourteen minutes it was divided among Subject Addresses 1-4; two days later Tether froze those addresses, and a residual 3.83 million USDT moved through twelve further addresses before being frozen in Subject Address 5; and "[f]ollowing the freeze," counsel for the owner of every one of those addresses (Baba Tech) wrote to investigators and claimed them. Compl. ¶¶ 84 -88 & Figs. 9-10. The Government traced every hop on the public ledger and reproduced the trace in the Complaint.

What the Complaint does not plead is a violation of § 1956 by anyone in connection with those transfers. The balance of the Consolidation Address "was withdrawn," "rapidly moved," and "was then divided up and sent," *Id.* at ¶¶ 84-85. The Complaint never says who conducted those transactions, what that person knew about the source of the funds, or why the transactions were made. It alleges no mixer (*see*, *e.g.*, *United States v. Sterlingov,* 755 F. Supp. 3d 17, 25-26 (D.D.C. 2024)), no bridge or chain hopping (*see*, *e.g.*, *United States v. 280 Virtual Currency Accounts*, No. 20-2396 (TJK), 2024 WL 2049002 at *5 (D.D.C. 2024)), no nominee (*see*, *e.g.*, *United States v. Adefehinti*, 510 F.3d 319, 322–24 (D.C. Cir. 2007)), no false identity (*see*, *e.g.*, *United States v. 113 Virtual Currency Accounts*, No. 20-606 (TJK), 2024 WL 940141 at *9 (D.D.C. Mar. 5, 2024)), and no conversion to another asset or off-ramp (*Id.*). Its own pleaded facts supply the explanation the money laundering statute treats as innocent: the owner of an operating wallet moved its balance to other addresses it controlled when a third party began freezing the wallet, and then told the Government the addresses were its own.

Under *Cuellar v. United States*, 553 U.S. 550 (2008), and the D.C. Circuit's decisions in *United States v. Adefehinti*, 510 F.3d 319 (D.C. Cir. 2007), *United States v. Law*, 528 F.3d 888

(D.C. Cir. 2008), and *United States v. Stoddard*, 892 F.3d 1203 (D.C. Cir. 2018), that is not concealment money laundering.

Concealment requires proof that the purpose, not merely the effect, of a transaction was to conceal a listed attribute of the funds; "how one moves the money is distinct from why one moves the money," and "[e]vidence of the former standing alone, is not sufficient to prove the latter." *Cuellar*, 553 U.S. at 566. Transactions "an observer" could follow "with ease," in the parties' own names, with a "simple, benign reason" behind them, show no "indicia of a design to conceal." *Adefehinti*, 510 F.3d at 323 to 324; *Law*, 528 F.3d at 897; *Stoddard*, 892 F.3d at 1215. Cases sustaining a concealment theory involved a third party, a nominee, a sham entity, an off-ramp, or an opaque container that severed the visible link between the funds and their source.[3] Here, the link was never severed; the Government's own figures follow the funds from the Consolidation Address into every Subject Address, and nothing about the transfers, as pleaded, made the funds harder to trace than they were before.

Baba Tech does not ask the Court to weigh evidence or to hold the Government to proof at the pleading stage. It accepts that Supplemental Rule G(2)(f) requires only "sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial," and that 18 U.S.C. § 983(a)(3)(D) precludes dismissal for want of evidence at filing. Rather, taking every allegation as true, the Complaint does not plead the elements of the

[3] *See, e.g.*, *United States v. Bikundi*, 926 F.3d 761, 785–86 (D.C. Cir. 2019) (defendants "created an elaborate network of bank accounts involving two sham corporations and funneled money into them, effacing any obvious link to D.C. Medicaid or the health care business"); *United States v. Tobin*, 676 F.3d 1264, 1290 (11th Cir. 2012) (defendant had his new wife "open a bank account in her name" and deposited withdrawn funds there after a search warrant); *United States v. Bowman*, 235 F.3d 1113, 1116 (8th Cir. 2000) (robber "shifted at least some of that deposit into and out of various other [safe deposit] boxes," supporting an inference that he "was deliberately moving the proceeds around so as to make tracking the money difficult"); *113 Virtual Currency Accounts*, 2024 WL 940141 at *6, *9 (launderers ran a "peel chain layering process designed 'to obfuscate the [virtual currency] trail,'" submitted "falsified identification photos" to exchanges, and converted proceeds to gift cards); *Sterlingov*, 755 F. Supp.3d 17, 25-26 (cryptocurrency mixer whose function was to sever the link between deposit and withdrawal); *United States v. 1407 North Collins*, 901 F.3d 268, 274-76 (5th Cir. 2018) (claimants "commingled tainted and untainted funds, used commingled funds as collateral, and moved funds through multiple accounts" "in order to hide criminal proceeds").

offense on which Count Two's reach to the untraced remainder depends for the following four reasons.

*First*, as to the July 26 to 29 transfers, the Complaint pleads no design to conceal or disguise the money; it pleads only the manner of the transfers.

*Second*, the Complaint identifies no transactor and pleads no knowledge for those transfers; the knowledge elements of § 1956 describe a state of mind, and the Complaint never alleges any such knowledge of unlawful activity or an attempt to conceal it.

*Third*, the § 1956(a)(2)(B)(i) international theory fails as a matter of law for those transfers because the Complaint alleges no transfer "from a place in the United States to or through a place outside the United States," or the reverse, by anyone with the statutory knowledge; it alleges wallet-to-wallet transfers among unhosted addresses with no geographic origin or destination.

*Fourth*, and independently, even if the Court were to conclude that the July 26 to 29 transfers are adequately pleaded as concealment transactions, § 981(a)(1)(A) still cannot reach the untraced 24.8 million on this Complaint, because the Complaint never alleges that the pooling of funds in the Consolidation Address was itself designed to conceal, which is the allegation courts applying the "involved in" rule to commingled funds have required.

Each defect is a question of what the Complaint pleads, not of what the Government can prove. The Court should thus dismiss Count Two insofar as it seeks forfeiture of Defendant Property other than the 2,329,482 USDT purportedly traced to the victims identified in the Complaint.

## BACKGROUND

The facts discussed herein are drawn from the Complaint and are accepted as true for purposes of this Motion only. Baba Tech does not admit them and reserves all defenses.

### A. The Fraud Schemes and the Consolidation Address

The Complaint describes "cryptocurrency investment fraud" schemes in which unidentified "[c]riminals believed to be located abroad" induced twenty-three victims to send virtual currency to addresses the criminals controlled. Compl. ¶¶ 1, 31-69. It alleges that the stolen currency "was quickly laundered through a series of transactions on the blockchain designed, at least in part, to conceal and disguise the nature, location, source, ownership, and control of the [cryptocurrency investment fraud ('CIF')] scheme," and that "[a]fter a series of transactions, the stolen virtual currency was consolidated with virtual currency from other sources, including from other confirmed and suspected victims, in a single address," which the Complaint calls the "Consolidation Address." *Id.* at ¶ 70. The Complaint describes the intermediary "hops" between the victims' deposits and the Consolidation Address as the work of "criminals" who "use consolidation wallets to obfuscate the source of funds." *Id.* at ¶¶ 72-74. A chart lists, for each victim, the "Loss Traced" to the Consolidation Address; the total is 2,329,482 USDT. *Id.* at ¶ 81 (Fig. 7).

The Consolidation Address was not a dormant repository. The Complaint alleges that it "was active between June 2025 through July 2025," that it "conducted approximately 708 transactions through which it received and sent approximately over 57,500,000 USDT," and that the Government's tracing "focus[es] primarily on the funds that were later transferred to Subject Addresses 1-5." *Id.* at ¶¶ 76, 83(a). The Complaint alleges that the address "has significant indirect receiving exposure to addresses flagged as scams," meaning "funds that came from a

flagged address but transited through at least one other address before reaching the destination," and lists the "scam clusters" identified by "a reliable blockchain analytics tool." *Id.* ¶ 83(b) & Fig. 8. It does not allege that any particular deposit into the Consolidation Address, other than the 2,329,482 USDT traced in Figure 7, was the proceeds of a crime.

**B. The July 26 to 29 Transfers**

The transactions which involve the untraced 24.8 million USDT are pleaded in three paragraphs. "On or about July 26, 2025, Tether attempted to voluntarily freeze the USDT in the Consolidation Address, then valued at approximately 27 million USDT. The full USDT balance was withdrawn, however, just as Tether was applying the freeze." *Id.* at ¶ 84. The funds "rapidly moved through several addresses and into address 0xfFc99C," from which "[o]ver 27 million USDT was then divided up and sent to four addresses: Subject Addresses 1-4. The flow of funds occurred in just 14 minutes, and the USDT transactions were the first such transactions between the Consolidation Address and Subject Addresses 1-4." *Id.* at ¶ 85 & Fig. 9. "On or about July 28, 2025, Tether voluntarily froze Subject Addresses 1-4. Tether also tried to freeze the funds in 0xfFc99C, but the approximately 3.83 million USDT in 0xfFc99C continued to move through 12 new addresses in rapid succession," until Tether froze them in Subject Address 5. *Id.* at ¶ 86 & Fig. 10.[4] Each freeze was made "[p]ursuant to a law enforcement request." *Id.* at ¶ 87; *see Id.* at ¶ 84 n.10.

The Complaint alleges that "Subject Addresses 1-5 are unhosted wallet addresses the owner(s) of which cannot be easily identified." *Id.* at ¶ 87. In the next paragraph it alleges that "[f]ollowing the freeze, an attorney representing B.T. Ltd. emailed investigators claiming that B.T. Ltd. is the owner of Subject Addresses 1-5 and the Consolidation Address," that "B.T. Ltd.

[4]Paragraph 86 refers to "Subject Address 7." The Complaint defines only five Subject Addresses, and Figure 10 and paragraphs 15 and 87 make clear that Subject Address 5 was intended.

appears to be the developer of an application previously listed on the Apple App Store as a cryptocurrency trading platform," first released "in or around June 2025," and that "[i]n the month that followed, the Consolidation Address received and sent over 57,500,000 USDT, including more than 2.3 million USDT directly traceable to known victims." *Id.* at ¶ 88.

Critically, the Complaint does not allege who caused the July 26 to 29 transfers, what that person knew about the source of any funds in the Consolidation Address, or why the transfers were made. It does not allege that the funds passed through a mixer, a bridge, an exchange, or any third party; that they were converted to any other asset or to fiat currency; that any address was held in a false or nominee name; or that anything about the transfers obscured the path the Government's own figures depict. A seizure warrant issued on November 28, 2025, and on April 7, 2026 Tether burned the frozen tokens and reissued equivalent USDT to a Government-controlled address. *Id.* at ¶¶ 16, 89.

### C. The Counts

Count One alleges that the Defendant Property "includes property constituting or derived from proceeds traceable to wire fraud and conspiracy to commit wire fraud" and is forfeitable under § 981(a)(1)(C). *Id.* at ¶¶ 90-91.

Count Two alleges that the Defendant Property "constitutes property involved, or traceable to property involved in, (a) domestic and international concealment of money laundering transactions committed in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(a)(2)(B)(i); and (b) a conspiracy to engage in money laundering, committed in violation of 18 U.S.C. § 1956(h)," and is forfeitable under § 981(a)(1)(A). *Id.* at ¶¶ 92-93. The Complaint invokes Supplemental Rule G and 18 U.S.C. §§ 981 and 983; it does not invoke 18 U.S.C. § 984. *Id.* at ¶ 7.

**D. Procedural Posture**

Baba Tech filed its Verified Claim to the entirety of the Defendant Property on August 28, 2026 (ECF 103), together with a motion addressing the timeliness of the claim (ECF 104). Specifically, the motion noted that Baba Tech's legal counsel informed the FBI that Baba Tech was the owner of the same five virtual currency addresses identified in the Verified Complaint, and expressly requested notice of any forfeiture proceedings involving those addresses. ECF 104 at 1-2. However, Baba Tech notes that the Government did not send notice of this action, but instead published a notice on www.forfeiture.gov even though the Government's investigators and attorneys corresponded with Baba Tech's counsel as recently as one week before the Verified Complaint was filed. *Id.* at 2. The Government did not oppose Baba Tech's motion addressing the timeliness of its claim (ECF 108), and the Court granted the motion via Minute Order on September 8, 2026.

The Verified Claim asserts that Baba Tech owned and exclusively controlled the Subject Addresses and the Consolidation Address. ECF 103 at ¶¶ 2, 6-7. A claimant "who establishes standing to contest the forfeiture of assets may move to dismiss the government's complaint under Rule 12(b)." *United States v. 8 Gilcrease Lane*, 587 F. Supp. 2d 133, 138 (D.D.C. 2008); Supp. R. G(8)(b)(i). Accordingly, Baba Tech files this Motion within the time provided by Supplemental Rule G(5)(b).

**LEGAL STANDARD**

A claimant with standing "may move to dismiss the action under Rule 12(b)," and "[t]he sufficiency of the complaint is governed by Rule G(2)." Supp. R. G(8)(b)(i)-(ii). Rule G(2)(f) requires a forfeiture complaint to "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." That burden is proof by a preponderance of the evidence that the property is subject to forfeiture (18 U.S.C. § 983(c)(1)),

and, where "the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense," proof of "a substantial connection between the property and the offense." *Id.* § 983(c)(3).

This Court has described Rule G(2)(f) as "a heightened burden for pleading," *United States v. All Assets Held at Bank Julius Baer & Co.*, 571 F. Supp. 2d 1, 16-17 (D.D.C. 2008), and as "somewhat more exacting than the liberal notice pleading standard contemplated by Rule 8(a)(2)," a requirement "designed to guard against the improper use of seizure proceedings and to protect property owners against the threat of seizure upon conclusory allegations." *United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 14 (D.D.C. 2013). However, the standard "is not particularly onerous," and a complaint suffices if it "allege[s] enough facts so that the claimant may understand the theory of forfeiture, file a responsive pleading, and undertake an adequate investigation." *United States v. Three Sums Totaling $241,386.58 in Seized U.S. Currency*, No. 18-cv-750 (RBW), 2021 WL 2255174 at *4 (D.D.C. June 3, 2021) (quoting *United States v. One Gulfstream*, 941 F. Supp. 2d 1, 14 (D.D.C. 2013), and *United States v. $1,071,251.44 of Funds Associated with Mingzheng Int'l Trading Ltd.*, No. 17-cv-01166 (KBJ/GMH), 2018 WL 3949962 at *9 (D.D.C. June 29, 2018)). "No complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property." 18 U.S.C. § 983(a)(3)(D); Supp. R. G(8)(b)(ii).

The plausibility standard of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), applies alongside Rule G(2)(f). *Three Sums*, 2021 WL 2255174 at *3-4; *United States v. Sum of $70,990,605*, 4 F. Supp. 3d 189, 195-97 (D.D.C. 2014).

The Court accepts well-pleaded factual allegations as true and construes them in the Government's favor, but "[t]hreadbare recitals of the elements of a [forfeiture] cause of action, supported by mere conclusory statements, do not suffice," and the Court need not "accept legal conclusions cast as factual allegations" or "inferences drawn by [the] plaintiff if those inferences are not supported by the facts set out in the complaint." *Three Sums*, 2021 WL 2255174 at *3-4 (quoting *Iqbal*, 556 U.S. at 678, and *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012)); *accord Bank Julius Baer*, 571 F. Supp. 2d at 15 ("the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint"). Allegations that "merely describe[ ] the property, and, parroting the language of the statute, state[ ] that [the property is] forfeitable" do not meet the standard. *United States v. $429,900.00 of Blocked Funds Associated with Ryer Int'l Trading Ltd.*, No. 20-2546 (RC), 2021 WL 5050070 at *7 (D.D.C. Nov. 1, 2021) (quoting *United States v. Pole No. 3172, Hopkinton*, 852 F.2d 636, 638-39 (1st Cir. 1988)). Allegations that a party "acted in ways consistent with" wrongdoing "but also equally well explained by legitimate economic incentives, do 'not suffice ... to show illegality.'". *Sum of $70,990,605*, 4 F. Supp. 3d at 198 (quoting *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1051-52 (D.C. Cir. 2012)); *see Iqbal*, 556 U.S. at 678 (facts "merely consistent with" liability "stop[ ] short of the line between possibility and plausibility").

Because § 981(a)(1)(A) reaches property "involved in a transaction or attempted transaction in violation of section 1956," the Government must plead facts supporting a reasonable belief that it can prove at trial that a § 1956 violation occurred.

In *Bank Julius Baer*, this Court identified the elements of § 1956(a)(1)(B)(i) that the complaint must address: that a person "(1) knowingly conducted a 'financial transaction,' (2)

which he knew involved funds that were the proceeds of some form of unlawful activity, (3) where the funds involved in the financial transaction in fact were the proceeds of a 'specified unlawful activity,' and (4) that the defendant engaged in the financial transaction knowing that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of such unlawful activity." 571 F. Supp. 2d at 11 (citing *United States v. Tarkoff*, 242 F.3d 991, 994 (11th Cir. 2001)). Courts in and out of this District have applied the same elements, drawn from the criminal cases construing § 1956, in civil in rem actions. *See United States v. 113 Virtual Currency Accounts*, No. 20-606 (TJK), 2024 WL 940141 at *5-6 (D.D.C. Mar. 5, 2024); *United States v. 674,739.480211 USDT of Tether Cryptocurrency*, No. 5:25-cv-01040 (BKS/PJE), 2026 WL 592743 at *8 (N.D.N.Y. Mar. 3, 2026). The Government must plead facts from which the Court can reasonably believe that a transaction with the statutorily required design, conducted with the statutorily required knowledge, took place. A count that describes the movement of property and appends the statutory label pleads no more than the "possibility" of a violation and must be dismissed. *Iqbal*, 556 U.S. at 678.

## ARGUMENT

Count Two rests on two sets of transactions. The first set of allegations involves the fraudsters' purported layering of victim deposits into the Consolidation Address, pleaded in paragraphs 70 to 75. As Part IV explains, the only Defendant Property "traceable to" property involved in those transactions is the 2,329,482 USDT the Complaint traces from the victims in Figure 7. Baba Tech does not challenge those allegations in this Motion.

The second set of allegations, and the only set of transactions involving the 24.8 million USDT remainder of the Defendant Property, is the July 26 to 29 movement of the Consolidation

Address balance into the Subject Addresses. Compl. ¶¶ 84-86. The Government's theory is that those transfers were themselves concealment transactions, so that every USDT transferred was "involved in" a § 1956 violation. The theory fails for four independent reasons. First, the Complaint does not plead the design element; it pleads the manner of the July 26 to 29 transfers, not their purpose, and alleges nothing that made the funds more concealed after the transfers than before (Part I). Second, the Complaint pleads no facts showing that anyone conducted the transfers knowing the funds were proceeds of unlawful activity or knowing of a design to conceal them (Part II). Third, the § 1956(a)(2)(B)(i) international theory cannot reach the untraced funds because the Complaint alleges no transfer of those funds into or out of the United States (Part III). Fourth, even if the transfers were adequately pleaded as concealment transactions conducted with the requisite knowledge, § 981(a)(1)(A) still could not reach the untraced 24.8 million USDT, because the Complaint never alleges that the pooling of funds in the Consolidation Address was itself designed to conceal (Part IV).

## I. THE DESIGN ELEMENT REQUIRES PURPOSE, NOT MANNER, AND THE COMPLAINT PLEADS ONLY MANNER

Forfeiture under § 981(a)(1)(A) reaches only property "involved in" an actual violation of § 1956. The Government must therefore plead the violation itself (*see United States v. Real Prop. Identified as Parcel 03179-005R*, 311 F. Supp. 2d 126, 128-29 (D.D.C. 2004)), including, for a concealment theory, conduct designed to conceal the nature, location, source, ownership, or control of the proceeds under § 1956(a)(1)(B)(i). *See United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 571 F. Supp. 2d 1, 11 (D.D.C. 2008). The substantive elements are the ones the criminal courts apply; the civil action differs only in that the Government carries its burden by a preponderance of the evidence (18 U.S.C. § 983(c)(1)), and need not obtain a conviction. *See United States v. Kivanc*, 714 F.3d 782, 795-96 (4th Cir. 2013) (in § 981(a)(1)(A)

action, Government "must prove a specific intent to conceal" by a preponderance of the evidence). The "involved in" and "substantial connection" requirements of § 983(c)(3) determine which property is reachable once a violation is shown; they do not relieve the Government of proving the violation. *See 674,739.480211 USDT*, 2026 WL 592743 at *8-9 (considering whether the complaint adequately alleged a violation of § 1956 and then whether the Government had established a "substantial connection" under § 983(c)(3)).

Both concealment provisions require that the transaction or transfer be "designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i), (a)(2)(B)(i). In *Cuellar*, the Supreme Court held that "design" in this context "means purpose or plan; *i.e.*, the intended aim of the transportation." 553 U.S. at 563. The Court rejected the Government's "structural" reading, under which secretive handling of funds would itself establish the element, because that reading "would capture individuals who structured transportation in a secretive way but lacked any criminal intent (such as a person who hid illicit funds *en route* to turn them over to law enforcement)." *Id.* at 565. "[H]ow one moves the money is distinct from why one moves the money. Evidence of the former, standing alone, is not sufficient to prove the latter." *Id.* at 566. Concealment "requires proof that the purpose" of the transportation, "not merely [its] effect," "was to conceal or disguise a listed attribute." *Id.* at 567.

The D.C. Circuit applied the same principle to the transaction prong before *Cuellar* and has reaffirmed it since. In *Adefehinti*, the court reversed concealment convictions where the defendants had deposited a fraudulently obtained check and then divided the proceeds among several accounts, including an account belonging to an unrelated third party. 510 F.3d at 321-22. "The money laundering statute criminalizes behavior that masks the relationship between an

individual and his illegally obtained proceeds; it has no application to the transparent division or deposit of those proceeds." *Id.* at 322. The "necessary intent to conceal requires 'something more' than the mere transfer of unlawfully obtained funds"; "subsequent transactions must be specifically designed to hide the provenance of the funds involved." *Id.* (quoting *United States v. Esterman*, 324 F.3d 565, 572 (7th Cir. 2003), and *United States v. Jackson*, 935 F.2d 832, 843 (7th Cir. 1991)). A dispositive fact was transparency: "An observer who reads the endorsement on the initial check and studies the names and numbers on the subsequent deposit slips and checks could discern the money trail with ease. The record has no suggestion that the prosecutors and law enforcement agents had any difficulty doing so." *Id.* at 323 to 324.

In *Law*, the court reversed a concealment conviction based on a drug dealer's payment of a mortgage held in another person's name. 528 F.3d at 895-98. Section 1956 "prohibits the laundering of money, not merely the spending of money obtained illegally. Thus, the Government must prove that [the subject transaction was] motivated by a desire to conceal or disguise the source or the ownership of the money." *Id.* at 896 (quoting *United States v. Wynn*, 61 F.3d 921, 924 (D.C. Cir. 1995)). Other circuits hold the same. Concealment money laundering "requires evidence of something more than a simple transfer of funds between two accounts, each bearing the parties' correct name. There must be some evidence that the funds are more concealed after the transaction is completed than before." *United States v. Johnson*, 440 F.3d 1286, 1293 (11th Cir. 2006) (emphasis added). Further, a transaction undertaken to obtain or keep control of funds is not designed to conceal them even if it has "aspects of concealment"; the defendant in *Cuellar* "concealed the money in order to move it; he did not move the money in order to conceal it." *United States v. Carman*, 186 F. Supp. 3d 657, 666-68 (E.D. Ky. 2016).

Measured against these authorities, paragraphs 84 to 86 plead manner and nothing else. They plead speed ("just 14 minutes"; "rapid succession"), novelty ("the first such transactions between the Consolidation Address and Subject Addresses 1-4"), and timing ("just as Tether was applying the freeze"). Compl. ¶¶ 84-86. None of those facts speak to purpose, and the Complaint pleads no facts that do. Even accepting each of these factual allegations as true, it does not state a claim for concealment money laundering.

The Complaint does not allege the "disguise." The Government does not allege that the funds were more concealed after the transaction than before. As in other cases, the Complaint could have included any number of facts that, if true, would state a claim for concealment money laundering. For example, the Complaint does not allege that the Subject Addresses were held in a false name or in the name of a nominee, that the transfers passed through any third party, exchange, mixer, or bridge, that the USDT was converted into any other asset, or that the destination addresses were any less visible on the Ethereum blockchain than the Consolidation Address had been. To the contrary, the Complaint pleads that the Government followed the funds from the Consolidation Address, through 0xfFc99C, into Subject Addresses 1-4, and through twelve intermediate addresses into Subject Address 5, and it reproduces that path in Figures 9 and 10. *Id.* ¶¶ 85-86. That is the money trail an observer "could discern . . . with ease," with "no suggestion that the prosecutors and law enforcement agents had any difficulty doing so." *Adefehinti*, 510 F.3d at 323 to 324. Indeed, the Complaint alleges that the funds were frozen at law enforcement's request within three days of the first transfer. Compl. ¶¶ 86-87. Funds that a private issuer can immobilize on request, contained on a public ledger, are not "more concealed after the transaction is completed than before." *Johnson*, 440 F.3d at 1293.

Because the Complaint does not allege the 24.8 million in USDT was transferred out of the Consolidation Address in order to disguise the illicit proceeds (which it has identified as the 2.3 million in USDT), the Government fails to state a claim. The Government's conclusory labels do not fill the gap. The Complaint's allegations that the fraudsters' pre-consolidation transfers were "designed, at least in part, to conceal" (Compl. ¶ 70), and its generalizations about how "criminals" behave (*Id.* ¶¶ 73-74), describe the alleged layering of victim funds into the Consolidation Address by the perpetrators of the fraud (*i.e.*, the 2.3 million in USDT; not the 24.8 million in USDT). They say nothing about the design of the July 26 to 29 transfers, which the Complaint never attributes to the fraudsters and never characterizes as designed to conceal anything. Paragraph 92 supplies the statutory words, but a count that describes property and, "parroting the language of the statute, state[s] that [the property is] forfeitable" does not satisfy Rule G(2)(f). *Ryer*, 2021 WL 5050070 at *7.

The transfer from the so-called "Consolidation Address" to the Subject Addresses 1-5 involved no such indicators of design to conceal, and the Complaint thus fails to plead a violation of § 1956 with respect to the 24.8 million USDT of the Defendant Property which was not purportedly traced to any victim.

## II. THE COMPLAINT PLEADS NO KNOWLEDGE BY ANYONE WHO CONDUCTED THE TRANSFERS

Concealment money laundering also requires knowledge. The person conducting the transaction must know "that the property involved in a financial transaction represents the proceeds of some form of unlawful activity," and must conduct the transaction "knowing that the transaction is designed" to conceal a listed attribute. 18 U.S.C. § 1956(a)(1)(B)(i); *see Id.* § 1956(a)(2)(B)(i) (same knowledge requirements for transfers); *Cuellar*, 553 U.S. at 560 to 561 (Government must prove the defendant "knew that these funds 'represent[ed] the proceeds of

some form of unlawful activity'" and "knew that 'such transportation' was designed to conceal or disguise"); *Bank Julius Baer*, 571 F. Supp. 2d at 11. The D.C. Circuit treats knowledge of the design as a distinct requirement even where knowledge of the funds' source is assumed; in *Stoddard*, the Government "fail[ed] to point to any evidence that the transaction was designed to conceal the source of the funds (much less that Cobble had knowledge of any such design)." *Stoddard*, 892 F.3d at 1215. The knowledge must belong to a person who actually conducted the transaction; the Eleventh Circuit vacated a concealment count in *Johnson* because the record did not show that the defendant "caused, directed, induced, or in any way controlled the particular transfer" at issue. *Johnson*, 440 F.3d at 1290 to 1291. This Court has recognized that even where the Government need not name the parties to a transaction, "it should be clear that the Government knows their identity and their connection to the . . . scheme." *United States v. $2,016,894.47 of Funds Associated with Cooperating Co. 1*, No. CV 19-803 (RC), 2025 WL 1575706 at *5 (D.D.C. Mar. 5, 2025).

Nothing in the Complaint comes close. There are no allegations that anyone acted with knowledge of unlawful activity regarding any transfers of assets between July 26 to 29. The Government has pleaded a set of blockchain transactions and asked the Court to infer, from timing alone, that whoever made them knew the funds were criminal proceeds and intended to hide them. Rule G(2)(f) requires "sufficiently detailed facts," not an invitation to assume the elements. The inference the Government seeks is one the Court "need not accept" because it is "unsupported by facts alleged in the complaint." *Bank Julius Baer*, 571 F. Supp. 2d at 15. With no facts pleaded which would support a claim of knowledge of unlawful activity or knowledge of a design to conceal the proceeds of such unlawful activity, Count Two fails as to the 24.8 million USDT of the Defendant Property which was not purportedly traced to any victim.

<u>The § 1956(h) Theory Does Not Cure the Defects</u>

Count Two also invokes § 1956(h), which punishes "[a]ny person who conspires to commit any offense defined in" § 1956 or § 1957. A conspiracy to launder requires an agreement between at least two persons to conduct a transaction with the knowledge and purpose the substantive statute requires. *See United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1354 (D.C. Cir. 2002) (§ 1956 liability turns on proof that the defendant "knew that the transaction 'represents the proceeds' of unlawful activity" and intended to promote or conceal). Even if the Complaint were to plead a conspiracy among the unidentified fraudsters to launder victim funds into the Consolidation Address (Compl. ¶¶ 1, 70, 73), it does not allege that the person(s) who made the July 26 to 29 transfers were one of those conspirators, agreed with them, or shared their objective. The conspiracy theory therefore adds nothing to Count Two as to the transfers that placed 24.8 million USDT of the Defendant Property in the Subject Addresses; it rises or falls with the concealment allegations addressed above.

## III. THE § 1956(a)(2)(B)(i) INTERNATIONAL THEORY CANNOT REACH THE UNTRACED 24.8 MILLION USDT BECAUSE THE COMPLAINT ALLEGES NO TRANSFER OF THOSE FUNDS INTO OR OUT OF THE UNITED STATES

Section 1956(a)(2)(B)(i) applies to one who "transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States," with the requisite knowledge and design. The border crossing is an element. "[T]he only substantive difference between [§ 1956(a)(1)(B)(i) and § 1956(a)(2)(B)(i)]…is whether the funds were transferred out of the United States" (*Johnson*, 440 F.3d at 1291 n.4), and the Government "must establish that [the defendant] transferred funds from within the United States to a place outside of the country." *Id.* at 1290.

The Supreme Court reads the statute the same way. The "critical transportation" under § 1956(a)(2)(B)(i) is the transfer that takes the funds out of the United States, not "the transportation of the funds within this country on the way to the border." *Cuellar*, 553 U.S. at 562.

This Court has enforced the border crossing element at the pleading stage. In *Bank Julius Baer*, it sustained § 1956(a)(2) claims only because the complaint alleged that the funds moved "to and then from United States financial institutions," and it distinguished *United States v. Kramer*, 73 F.3d 1067 (11th Cir. 1996), on the ground that there "the transfer at issue went directly from Switzerland to Luxembourg; at no time did funds pass through a United States financial institution." *Bank Julius Baer*, 571 F. Supp. 2d at 13.

As to the untraced 24,792,088.90 USDT, the international theory can rest only on the July 26 to 29 transfers given those transfers are the only pleaded transactions in which the untraced funds were involved. The Complaint alleges nothing about the location of the July 26 to 29 transfers. It alleges that the Consolidation Address and the Subject Addresses are "unhosted wallet addresses" (Compl. ¶ 87), which by the Complaint's own definition are wallets "through which the user has complete control over storing and securing their private keys" and that "do not require a third party's involvement." *Id.* at ¶ 24. It does not allege where the person who controlled those keys was located on July 26 to 29, 2025, where the funds originated, where they were destined, or that they passed through any financial institution anywhere.

The Complaint's only geographic allegations concern the front end of the purported fraud, and they concern only the traced funds. The Complaint alleges that the fraudsters are "believed to be located abroad" (*Id.* at ¶ 1); that victim K.T. is "a San Diego resident" (*Id.* at ¶ 36; and that the victims sent their USDT from accounts at Coinbase, Crypto.com, and Robinhood

to unhosted "0 Level" addresses the criminals provided, from which the fraudsters layered it into the Consolidation Address (*Id.* at ¶¶ 71 to 80). If those allegations imply any cross-border movement at all, it is the victims' payments into the scheme, at the moment their funds left their exchange accounts for wallets controlled by criminals "believed to be located abroad." *Id.* at ¶ 1. That movement cannot supply the missing element for the untraced funds, as such movement did not involve the untraced funds. The victims' payments moved the victims' own USDT, which is the 2,329,482 USDT the Complaint traces, and the Complaint does not allege that any of the untraced 24.8 million USDT was part of those transfers, came from abroad, or crossed a border at any point before, during, or after its time in the Consolidation Address. Moreover, a border the victims' funds may have crossed on the way into the fraud says nothing about where the July 26 to 29 transfers went. "The critical transportation" under § 1956(a)(2)(B)(i) is the transfer that crosses the border (*Cuellar*, 553 U.S. at 562), and each transfer is a separate offense that must independently satisfy the statute. *Bank Julius Baer,* 571 F. Supp. 2d at 13 to 14 (citing *Kramer*, 73 F.3d 1067).[5]

The Complaint's geography therefore cuts against the Government. The only border it implies was crossed by the victims' own funds, before those funds were allegedly commingled with anything in the Consolidation Address, and the transfers on which Count Two depends for the untraced 24.8 million USDT are alleged to have crossed no border at all. The §

[5] Nor could the victims' payments themselves have been the "violation of section 1956" in which any Defendant Property was "involved." 18 U.S.C. § 981(a)(1)(A). Unlike the promotion prong of § 1956(a)(2)(A), which "contains no 'proceeds' requirement" (*United States v. Krasinski*, 545 F.3d 546, 550 (7th Cir. 2008); *see United States v. Piervinanzi*, 23 F.3d 670, 680 (2d Cir. 1994)), the concealment prong reaches only transfers of funds that already "represent the proceeds of some form of unlawful activity." 18 U.S.C. § 1956(a)(2)(B). The transfer by which a victim's money first reaches a fraudster is the fraud, not the laundering of its proceeds. "Money laundering criminalizes a transaction in proceeds, not the transaction that creates the proceeds" (*United States v. Adefehinti*, 510 F.3d 319, 324 (D.C. Cir. 2007) (quoting *United States v. Mankarious*, 151 F.3d 694, 705 (7th Cir. 1998)), and "the laundering of funds cannot occur in the same transaction through which those funds first become tainted by crime." *United States v. Butler*, 211 F.3d 826, 830 (4th Cir. 2000).

1956(a)(2)(B)(i) theory is unsupported by any factual allegation as to those funds and should be dismissed as to them.

## IV. EVEN IF THE JULY 26 TO 29 TRANSFERS WERE ADEQUATELY PLEADED AS DESIGNED TO CONCEAL WITH KNOWLEDGE, COUNT TWO STILL CANNOT REACH THE UNTRACED 24.8 MILLION USDT

Even if the Court were to conclude that the July 26 to 29 transfers were adequately pleaded as concealment transactions with knowledge, Count Two would still fail as to the untraced 24.8 million USDT, because the Complaint does not plead the one fact that permits § 981(a)(1)(A) to reach commingled funds: that the pooling was itself designed to conceal.

### A. "Involved In" Reaches Commingled Funds Only Where the Pooling Was Designed to Conceal

Section 981(a)(1)(A) reaches property "involved in" a laundering transaction and "property traceable to such property." Courts construing the identical "involved in" language in § 982(a)(1) read it to include the funds laundered, any fees paid to the launderer, and property that facilitated the offense. *United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003) (quoting *United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998)). "[T]he mere pooling or commingling of tainted and untainted funds in an account does not, without more, render the entire contents of the account subject to forfeiture." *Id.* (quoting *Bornfield*, 145 F.3d at 1135). "Forfeiture of commingled funds, however, is proper when the government demonstrates that the defendant pooled the funds to facilitate or 'disguise' his illegal scheme." *Id.*

The reason for the limit is structural. Section 983(c)(3) requires, for any "involved in" theory, "a substantial connection between the property and the offense." A dollar that happens to sit in the same account as a tainted dollar has no connection to the offense at all unless its presence there served the laundering. To focus on the container rather than the funds, or on "the

identity of the depositor" rather than the property, "risks transforming an in rem action into an in personam suit," and "the Government may not satisfy its tracing burden simply by showing that criminal funds were once deposited into a particular account." *United States v. Sum of $70,990,605*, 128 F. Supp. 3d 350, 360 (D.D.C. 2015) (quoting Stefan D. Cassella, *Asset Forfeiture Law in the United States* § 11-4 (2d ed. 2013)). The Supreme Court has likewise recognized that the law "has tracing rules that help courts" separate "tainted funds" from "innocent funds" in a commingled account. *Luis v. United States*, 578 U.S. 5, 22 (2016) (plurality opinion).

### B. The Complaint Pleads Co-Location in a High-Volume Platform Wallet, Not Purposeful Pooling

The Complaint does not allege that anyone pooled funds in the Consolidation Address in order to disguise the victim funds. It alleges that the victims' USDT "was consolidated with virtual currency from other sources, including from other confirmed and suspected victims" (Compl. ¶ 70); that the address "received and sent approximately over 57,500,000 USDT" in "approximately 708 transactions" over two months (*Id.* at ¶¶ 76, 83(a)); that it "only received USDT from unhosted addresses" (*Id.* at ¶ 70); and that it had "indirect receiving exposure" to flagged clusters (*Id.* at ¶ 83(b)). Those allegations describe co-location. They do not allege that the "other sources" were deposited to provide cover for the victim funds, that the operator of the address intended the mixture to disguise anything, or that the approximately 55 million USDT of other funds served any function in the fraudsters' scheme. The Complaint's own characterization of B.T. Ltd. as "the developer of an application . . . listed on the Apple App Store as a cryptocurrency trading platform" (*Id. at* ¶ 88) supplies the ordinary explanation for a wallet that receives deposits from many self-custodied addresses: it is a platform deposit wallet, and platform deposit wallets receive customer funds from customers' wallets. The Complaint's

observation that the application later left the App Store and "had only two ratings and no reviews" (*Id.)* is mere innuendo, not an allegation that the platform was a sham, that it had no legitimate customers, or that the Consolidation Address was created as a concealment vehicle. Compare *United States v. Abhishek Krishnan's Real & Pers. Prop.*, 469 F. Supp. 3d 481, 497 (E.D.N.C. 2020) (untraced remainder not forfeitable where Government did not allege purposeful commingling), with *United States v. Real Prop. Located at 1407 North Collins St., Arlington, Texas*, 901 F.3d 268, 274-76 (5th Cir. 2018) (restraint upheld where Government alleged "commingling in order to hide criminal proceeds").

The Government's labels again do not substitute for facts. Paragraph 73(c) of the Complaint states that "[c]riminals use consolidation wallets to obfuscate the source of funds," and paragraph 74 asserts that "[t]here is no reason, economic or otherwise, for legitimate businesses or individuals to conduct cryptocurrency transfers in the above fashion." Both are conclusions of the kind this Court disregards under *Iqbal*. *Three Sums*, 2021 WL 2255174 at *3. On the Government's own figures the traced funds were roughly four percent of the flow through the address and 8.6 percent of the res. That is the "incidental or fortuitous connection" that the facilitation doctrine excludes, *United States v. Bikundi*, 125 F. Supp. 3d 178, 195 (D.D.C. 2015), not the arrangement "through which tainted funds could be transferred" that the doctrine reaches, *Puche*, 350 F.3d at 1153.

The most analogous decision confirms the result. In *674,739.480211 USDT*, the Government traced 443,953 of 674,739 USDT in a frozen Tether wallet to a pig-butchering victim and sought forfeiture of the whole balance under §§ 981(a)(1)(A) and (C). The court denied the motion. As to the "involved in" theory, "[t]he Government also does not allege facts supporting the forfeiture of the entire 674,739.480211 USDT; it is not clear to the Court how the

entire 674,739.480211 USDT was 'involved in a transaction or attempted transaction in violation of section 1956,' . . . where the verified complaint alleges that only 443,953 USDT TRON was traced from the Victim's accounts. As a result, the Government has not met its burden to establish a 'substantial connection between' Defendant Cryptocurrency and a money laundering offense under section 1956." 2026 WL 592743 at *9 (citing 18 U.S.C. § 983(c)(3)). The court acknowledged that "[s]ome courts have held that the entire contents of an account used to 'facilitate' money laundering are subject to forfeiture," but held that where the Government "has not adequately explained the connection" between the untraced funds and the offense, it could not find the entire amount forfeitable. *Id.* at *10 n.8.

### C. Neither the "Traceable To" Prong Nor § 984 Supplies an Alternative Route to the Untraced Funds

Count Two also pleads that the Defendant Property is "traceable to property involved in" laundering. Compl. ¶ 92. That prong requires tracing, and tracing caps forfeiture at the tainted amount; it cannot expand it. *Sum of $70,990,605*, 128 F. Supp. 3d at 360. The Complaint traces 2,329,482 USDT and nothing more. Compl. ¶ 81.

The Government also cannot fall back on 18 U.S.C. § 984, the fungible-property provision that relieves it of tracing in certain cases. The Complaint does not invoke § 984, and § 984 would not apply if it had. The statute reaches only "cash, monetary instruments in bearer form, funds deposited in an account in a financial institution (as defined in section 20 of this title), or precious metals." 18 U.S.C. § 984(a)(1). USDT held in an "unhosted wallet" that "do[es] not require a third party's involvement" (Compl. ¶ 24) is none of those things. Section 984 also bars any action to forfeit property "not traceable directly to the offense" commenced "more than 1 year from the date of the offense" (18 U.S.C. § 984(b)), a limit that Congress imposed as the price of dispensing with tracing and that the Government cannot evade by

relabeling untraced funds as "involved in" an offense. *See United States v. All Funds Presently on Deposit at Am. Express Bank*, 832 F. Supp. 542, 560-62 (E.D.N.Y. 1993). The Government must therefore proceed by tracing or by pleading a facilitation theory, and it has done neither as to the untraced 24.8 million USDT.

## CONCLUSION

Count Two reaches the untraced 24,792,088.90 USDT only if the Complaint pleads a violation of § 1956 in connection with the July 26 to 29 transfers, and it does not. First, the Complaint pleads only the manner of those transfers, their speed, novelty, and timing, and never alleges that their purpose was to conceal or disguise any attribute of criminal proceeds; the funds sat on the same public ledger after the transfers as before, and the Government followed every hop with ease. Second, the Complaint identifies no person who conducted the transfers and alleges no facts showing that anyone did so knowing the funds were the proceeds of unlawful activity or knowing of any design to conceal them. Third, the § 1956(a)(2)(B)(i) theory fails because the Complaint alleges no transfer of the untraced funds into or out of the United States; it pleads wallet-to-wallet movements among unhosted addresses with no pleaded origin, destination, or financial institution. Fourth, even if the transfers were adequately pleaded as concealment transactions, the Complaint never alleges that the pooling of funds in the Consolidation Address was itself designed to conceal, without which § 981(a)(1)(A) cannot extend from the 2,329,482 USDT the Government traced to the roughly 91 percent of the res it did not. Baba Tech therefore respectfully requests that the Court dismiss Count Two insofar as it seeks forfeiture of Defendant Property other than the 2,329,482 USDT traced to the victims identified in the Complaint, and order the Government to release the remaining 24,792,088.90 USDT to Baba Technology Limited as the owner of the addresses from which it was seized.

Respectfully submitted,

Date: September 18, 2026

RUMBAUGH LAW PLLC

/s/_Shane Rumbaugh__________

Shane M. Rumbaugh [1045153]
Nicholas R. Raffaele [1632764]
2400 Ansys Drive, Suite 102
Canonsburg, PA 15317
Tel: (724) 213-2591
Email: shane@rumbgh.com
Email: nick@rumbgh.com

*Counsel for Baba Technology Limited*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed this document using the CM/ECF system, which then sent a Notice of Electronic Filing to all registered attorneys in this case, including the following counsel:

Rick E. Blaylock, Jr.
U.S. Department of Justice
601 D Street, NW
Washington, DC 20004
rick.blaylock.jr@usdoj.gov
*Counsel for Plaintiff*

Christopher Klotz
Aylstock, Witkin, Kreis & Overholtz, PLLC
17 E. Main Street, Suite 200
Pensacola, FL 32502
cklotz@awkolaw.com
*Counsel for the AWKO Claimants*

Date: September 18, 2026

/s/ Shane Rumbaugh

Shane M. Rumbaugh [1045153]
Nicholas R. Raffaele [1632764]
2400 Ansys Drive, Suite 102
Canonsburg, PA 15317
Tel: (724) 213-2591
Email: shane@rumbgh.com
Email: nick@rumbgh.com

*Counsel for Baba Technology Limited*